**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Crim. No. 3:17-cr-00132-2** |
| | ) | **Judge Aleta A. Trauger** |
| **DAMION ANDERSON** | ) | |

## MEMORANDUM AND ORDER

Before the court is the Motion to Suppress Evidence (Doc. No. 100) filed by defendant Damion Anderson, seeking to suppress evidence seized pursuant to a search warrant from a home he was visiting. The Government has filed a Response (Doc. No. 115), and Anderson has filed a Reply (Doc. No. 120). An evidentiary hearing was held on April 20, 2018. For the reasons set forth herein, the court will **DENY** the Motion to Suppress.

## I.     Background

### A.     The Search Warrant and Affidavit

In support of his request for the issuance of a Search Warrant for 821 Lackey Circle in Gallatin, Tennessee on March 23, 2017 ("Warrant"), Investigator James Kemp of the Gallatin Police Department ("GPD") submitted a Search Warrant Affidavit ("Affidavit") in which he attested under oath that there was "probable cause" to believe that evidence of violations of "T.C.A. Section 39-13-201 Criminal Homicide, T.C.A. 39-17-417 Possession of a Controlled Substance, and T.C.A. 39-17-425 Possession of Paraphernalia" would be found at that location. (Doc. No. 100-1, at 1.) He described the evidence to be sought as including computers and related electronic devices "used to facilitate the aforementioned criminal activity"; controlled substances and paraphernalia such as scales, mixing devices, and packaging materials; financial

records; currency; and firearms, and "testified" that such evidence "is now located and may be found . . . on said premises. (*Id.* at 1–2.) The Affidavit described with some particularity the premises to be searched as "a public housing two story dwelling on Lackey Circle shared with unit '819.' . . . There is a front door that leads to '821' with the numbers '821' above the small porch." (*Id.* at 2.) And the Affidavit included the following summary as the basis for issuance of the warrant:

> Your Affiant is currently a certified law enforcement officer with the [GPD] and is currently assigned to the Criminal Investigations Division. Your Affiant has worked in the field of law enforcement for 11 years [and] has been to several specialized training schools involving the investigation, arrest, and prosecution of criminals engaged in the entire gambit of criminal activity. . . .

> On 3-23-17 the [GPD] responded to 562 Spencer Ave. located in Gallatin Sumner County in reference to a death investigation. . . . 23 year old Katherine Stone was located deceased in her bed she shared with her boyfriend Josh [Hunter]. In plain view laying on the bed beside Stone was a plastic bottle that appeared to have been used to smoke illegal narcotics based on my training and experience. There was also a grinder observed in plain view in the room.

> Your affiant interviewed Josh. Josh admitted that him, Stone, and Stone's sister, Kristen, went to purchase heroin the previous night from a guy known to him as "Pops" or "L" and a girl known at "Titi." Kristen stated that "Titi's" real name is Tatiana Johnson. I located a Tatiana Johnson in RMS and pulled her Tennessee driver's license and picture. The address listed on the DL is 821 Lackey Circle in Gallatin, Sumner County. I showed the DL photograph to both Josh and Kristen independently. Both identified the person in the photo as "Titi." Josh and Kristen then each pointed out independently 821 Lackey Circle as where they had purchased the heroin at the previous night. In front of 821 Lackey Circle was a 4D sedan bearing Tennessee tag 5E99M3. I ran this plate through dispatch and found it returned to Tatiana Johnson. I then called Gallatin Electric. They advised the electric was turned on at 821 Lackey Circle under the name of Tatiana Johnson.

> Josh stated that he and Katherine bought "4 points" of heroin from this house for $100.00. He stated that Katherine was given two points and he took two points. He stated that Katherine then ingested the heroin by snorting it shortly after they purchased it.

> Your affiant is seeking a search warrant for the house and property of **821 Lackey Circle Gallatin, Sumner County, Tennessee** for the above mentioned evidence. Your affiant feels that such evidence found on the above mentioned property will directly assist in the investigation and/or prosecution of T.C.A. Section 39-13-201

> Criminal Homicide, T.C.A. 39-17-417 Possession of a Controlled Substance, and T.C.A. Possession of Paraphernalia.

(*Id.* at 2.)

On the basis of that Affidavit, a judge of the Sumner County General Sessions Court issued the requested Warrant at 11:25 a.m. on March 23, 2017. (*Id.* at 5.) The GPD executed the Warrant on the same day. According to the defendant, during the search of 821 Lackey, police officers discovered a "tan-colored powder substance inside a plastic bag which was located inside a man's size-8 shoe which was located in a travel bag inside the home." (Doc. No. 100, at 2.) The substance weighed 19.2 grams and tested positive for heroin and Fentanyl. (*Id.*) Based on that evidence, defendant Damion Anderson, who was apparently an overnight guest at 821 Lackey and was present at the time the Warrant was executed, was arrested and indicted on charges of conspiracy to distribute heroin and fentanyl, the use of which resulted in the death of an individual, in violation of 21 U.S.C. § 846 (Count 1), and possession with the intent to distribute and distribution of heroin and fentanyl, the use of which resulted in the death of an individual, in violation of 21 U.S.C. § 841 and 18 U.S.C. § 2 (Count 2). (Indictment, Doc. No. 1.)

### B.     The Motion to Suppress and Hearing

The defendant filed his Motion to Suppress on March 16, 2018, asserting that (1) the allegations in Kemp's Affidavit were insufficient to establish probable cause because they did not include information showing "a fair probability" that illegal drugs would be found inside the home at 821 Lackey (Doc. No. 100, at 3 (quoting *Illinois v. Gates*, 462 U.S. 213, 238–39 (1983)); (2) the Affidavit was affirmatively and intentionally false and misleading insofar as it omitted material facts, the presence of which would have negated any possible conclusion of probable cause, including that the drug purchase occurred outside the home at 821 Lackey, rather

than inside, and that the purchase was from someone who identified himself only as Tatiana Johnson's "baby-daddy," rather than from Johnson herself; and (3) Kemp omitted other material facts from the affidavit to create the false impression that Kristen Stone and Josh Hunter were reliable informants, including (a) Hunter's use of some of the drugs before he went to work on March 22 and during his breaks at work; (b) his acknowledgment that he and Katherine Stone used unspecified "illegal drugs," including pills; (c) that Kristen Stone, Katherine's sister,[1] told two different stories about how she had spent the evening before her sister died, thus admittedly lying in at least one of them; and (d) that there were three adult "witnesses," in addition to Kristen and Hunter, but no indication that any of them could or would corroborate Hunter and Kristen's stories of the drug purchase at 821 Lackey.

The defendant argues that, as a result of material omissions that give rise to false impressions, the warrant is not supported by probable cause and is not salvaged by the good-faith exception established by *United States v. Leon*, 468 U.S. 897 (1984). The defendant also argues that *Leon* does not apply because the affidavit itself is so "bare bones" that no reasonable officer would believe that it supplies probable cause to search a home.

The Motion to Suppress specifically requested an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978),[2] "to demonstrate the material omissions which further undermine probable cause and, as with its bare-bones status, exclude this warrant from the good-faith exception." (Doc. No. 100, at 17.) Shortly after the motion was filed, the court set a hearing

---

[1] The court will refer to Katherine Stone (the decedent) and Kristen Stone by their first names, to avoid confusion.

[2] Under *Franks*, "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." 438 U.S. at 155–56.

for April 20, 2018. A large portion of that hearing was devoted to counsel's arguments as to whether a *Franks* hearing was warranted at all. The court ultimately determined, under *Franks*, that the defendant had carried his burden of establishing that the Affidavit contained a false statement that was either knowingly made or made with reckless disregard for the truth by stating that the heroin was purchased "from" the house at 821 Lackey, which suggested that the heroin came from inside the house. The court also permitted counsel for the defendant to inquire about other omissions from the warrant affidavit that counsel believed were material.[3]

The United States called Investigator Kemp to testify. Kemp testified that he arrived on the scene of Katherine Stone's death early in the morning. He noted that two men, Josh Hunter and Patrick Williams, were outside the home and others were inside. Katherine Stone lay deceased on her bed. Near her were a green plastic bottle that had puncture and burn marks on it, of the type that Kemp had seen people use to smoke marijuana. Katherine had foam coming out of her mouth. Based on his prior experience, Kemp immediately suspected a heroin overdose, particularly in light of Katherine's youth (age 23) and the absence of any signs of trauma or violence. He described the grinder on the dresser, which is also mentioned in his Affidavit, as the type of grinder commonly used to grind marijuana.

Kemp briefly interviewed Josh Hunter at the scene, and Hunter told him that, the night before her death, he and Katherine had purchased drugs from a person he identified as "Titi." He also mentioned someone called "Pops" or "L." Kemp had Hunter and Kristen transported to the police station for closer questioning.

Kemp recruited other officers to assist him in his investigation at that point. Officer

---

[3] The parties did not order a transcript of the hearing. The court's references to the testimony and argument given at the hearing are based on the court's recollection and detailed notes.

Brandon Troutt began re-interviewing Hunter, while Kemp was engaged in the paperwork necessary to obtain and execute a search warrant for the house in which Katherine had died. Once he had seen to that, he left the search of that house to another investigator and returned to the police station to oversee the interviews of Josh Hunter and Kristen Stone. It was during his interview at the police station that Hunter specifically stated that he and Katherine had purchased four "points" of heroin (or .4 grams) at 821 Lackey for $100. Kemp asked Hunter if he could take him to where he had purchased the heroin. Kemp and Troutt together drove with Hunter, who directed them to 821 Lackey. They parked across the street from the residence and could see that it was a two-level duplex with number 821, clearly marked with numbers above the porch on the right side of the building. A vehicle, the tag of which indicated it was registered to Tatiana Johnson, was parked directly in front of 821. Kemp stated that, by then, Hunter had already identified Tatiana Johnson as the person he knew as "Titi."

Kemp testified that, prior to the issuance of the Warrant, he never discussed with Hunter the precise details of where exactly the deal took place, whether inside the apartment or outside. He claimed that Hunter stated only that he and Katherine had gotten the drugs "from" 821 Lackey. Kemp testified that, when he completed the Affidavit, his understanding was that the drugs came "from" that residence. The only people Hunter had identified by then were Tatiana Johnson, or "Titi," who was his point of contact, and someone named "Pops." Kemp could not recall Hunter's precise language. The court questioned Kemp directly, asking him if he had asked Hunter whether he had gone to the door or inside the house. Kemp responded that, at that point, he and Troutt had not asked those precise questions. When asked why not, he responded that he had a lot of people to interview and a lot going on. Kemp stated that he later learned, but not before applying for the Warrant, that an individual—who identified himself only as Tatiana

Johnson's "baby-daddy"—had come out of the house and that the deal took place outside the house.

Kristen Stone was interviewed at the police station, initially by Officer Jones. During this interview, in describing the timeline of events prior to Katherine's death, she failed to mention that she had driven Katherine and Hunter to 821 Lackey to purchase drugs. Confronted with Hunter's story, which contradicted hers, she admitted that she had driven them there, while both her child and Katherine and Hunter's child were in the car. The two investigators who were involved with the process told Kemp that Kristen had agreed to show them where the drug purchase took place. Kristen had directed them to 821 Lackey and indicated that that was where she had driven Hunter and Katherine to purchase drugs.

Kemp testified that, after he obtained the Warrant, the investigation continued and many additional interviews were conducted, including additional interviews of Josh Hunter. Kemp claimed that he developed a substantial amount of information following the issuance of the Warrant but that he was in a hurry to obtain the Warrant because someone had died. Based on prior experience, he knew that, when one person dies from a "bad batch" of heroin, others would continue to die unless and until that particular batch was taken off the street. He further confirmed, however, that he did not have any concerns about whether the Warrant was properly supported at the time it was issued or about its validity when it was executed. He claimed to have included in his Affidavit all the information in his possession at the time he completed it.

On cross examination, Kemp confirmed that Kristen, when she was initially interviewed, stated only that she, her sister, their two children, and Josh Hunter had made a shopping trip to Walmart the evening before Katherine's death, that they had returned home after that, and that she had retired to her room around 10 p.m. (*See also* Doc. No. 100-2, at 7.) She changed her

story to corroborate Hunter's only after Kemp confronted her with the inconsistency between her story and Hunter's.

Kemp also testified that, at the time he completed the Affidavit, he knew nothing about Hunter's background other than that Hunter had told him that he and Katherine had "struggled" with drug use in the past, specifically heroin and pills. Kemp agreed that he did not include that information in the Affidavit. Kemp explained that Hunter had told him that the pill use had taken place months ago, and Hunter did not mention purchasing pills recently.[4] Kemp agreed that there is nothing in the Affidavit about phone contact with Tatiana Johnson. He stated initially that he did not learn about phone contact until later, but he then clarified that Josh Hunter had shown him Tatiana Johnson's telephone contact on his phone before he obtained the Warrant. Kemp was not questioned, and did not provide any details, about the telephone contact with Johnson. He agreed that he did not include information about phone contact between Hunter and Johnson in his Affidavit.

He agreed that he was aware, when he drafted the Affidavit, that Patrick Williams was living at the same house as Katherine, Kristen, and their respective children and boyfriends (Josh Hunter and Andy Long) and that Williams had come home from work at the same time as Hunter, had left after Katherine's body was discovered and returned shortly thereafter, and had later declined to be interviewed. Kemp agreed that he had not included any of that information in the Affidavit. He acknowledged that he became aware at some point that Williams had

---

[4] On cross-examination, as the court recalls, Kemp was asked whether—and agreed that– he had testified on direct that Hunter told him he had previously purchased drugs from someone named "Pops." The court's notes do not reflect that Kemp was ever asked that question on direct, and the parties have not pointed to any evidence in the record suggesting that Hunter stated that he had previously purchased drugs from "Pops." Kemp's interview notes indicate only that Hunter mentioned contact with someone named "Pops" or "L" and that he had actually obtained the drugs from a man who identified himself as Tatiana Johnson's "baby-daddy." (Doc. No. 100-2, at 16.) The record does not further identify that individual.

introduced Hunter and Katherine to Tatiana Johnson, but he was not sure whether he knew that at the time he completed the Affidavit.

Kemp was asked whether he knew that Hunter had used some of the heroin bought from Johnson before he went to work and more of it while he was at work. Kemp was not sure when he learned that information. He did not believe he had asked Hunter when he used it.

Kemp testified that he did not necessarily believe Hunter's statement that he and Katherine had been off drugs for a period of time prior to obtaining heroin from Tatiana Johnson, based simply on the state of the house in which they were living. He agreed that he did not include in his Affidavit a statement about whether Hunter was a habitual drug-user.

After Kemp testified, the court heard further argument from counsel for both parties and took the matter under advisement.

## II.     Analysis

### A.     Legal Standards

The Fourth Amendment prohibits the issuance of a search warrant without probable cause. U.S. Const. amend. IV. The Supreme Court has recognized that the right of a citizen to retreat into the home and "there be free from unreasonable governmental intrusion" stands at the core of the Fourth Amendment. *Kyllo v. United States*, 533 U.S. 27, 31 (2001) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). The same protection extends to the privacy of a person who is an overnight guest in another's home. *See Minnesota v. Olson*, 495 U.S. 91, 98–99 (1990) ("To hold that an overnight guest has a legitimate expectation of privacy in his host's home merely recognizes the every day expectations of privacy that we all share. . . . From the overnight guest's perspective, he seeks shelter in another's home precisely because it provides him with privacy, a place where he and his possessions will not be disturbed by anyone

but his host and those his host allows inside.").

"One of the touchstones of the reasonableness requirement is that the police must generally obtain a warrant based upon a judicial determination of probable cause before entering the home." *Ziegler v. Aukerman*, 512 F.3d 777, 785 (6th Cir. 2008). The job of the magistrate presented with a search warrant application is "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . , there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "There must, in other words, be a nexus between the place to be searched and the evidence sought." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (*en banc*) (internal quotation marks omitted). The court reviewing a motion to suppress has a duty to ensure that the magistrate who issued the warrant had a "substantial basis for concluding that probable cause existed." *Id.* (quoting *Gates*, 462 U.S. at 214). Generally, "[t]he review of the sufficiency of the evidence supporting probable cause is limited to the information presented in the four corners of the affidavit." *United States v. Berry*, 565 F.3d 332, 338 (6th Cir. 2009).

If the warrant is not supported by probable cause, then its execution results in a violation of the Fourth Amendment. *See United States v. Leon*, 468 U.S. 897, 900 (1984). Separate from the question of whether a constitutional violation occurred, however, is the question of a remedy. "When evidence is obtained in violation of the Fourth Amendment, the judicially developed exclusionary rule usually precludes its use in a criminal proceeding against the victim of the illegal search and seizure." *Illinois v. Krull*, 480 U.S. 340, 347 (1987). The exclusionary rule applies as well to the "fruits" of the illegally seized evidence. *Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963). The purpose of the exclusionary rule, however, is not to redress the

injury to the privacy of the search victim, as "[t]he ruptured privacy of the victims' homes and effects cannot be restored. Reparation comes too late." *United States v. Calandra*, 414 U.S. 338, 347 (1974) (quoting *Linkletter v. Walker*, 381 U.S. 618, 637 (1965)). Instead, "the rule's prime purpose is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures." *Id.*

The exclusionary rule is subject to broad exceptions, however. In particular, if the evidence in question was "obtained in objectively reasonable reliance" on the "subsequently invalidated search warrant," it should not be suppressed. *United States v. Leon*, 468 U.S. 897, 922 (1984). But the good-faith exception rule is itself subject to exceptions. Specifically, the good-faith exception does not apply in four situations:

> (1) when the affidavit supporting the search warrant contains a knowing or reckless falsity; (2) when the magistrate who issued the search warrant wholly abandoned his or her judicial role; (3) when the affidavit is so lacking in indicia of probable cause that a belief in its existence is objectively unreasonable; or (4) when the warrant is so facially deficient that it cannot reasonably be presumed valid.

*United States v. McPhearson*, 469 F.3d 518, 525 (6th Cir. 2006) (citations omitted)

The defendant argues in this case both that the Warrant was not supported by probable cause and that it is not saved by the *Leon* good-faith exception. As indicated above, he asserts that the Affidavit contains material and intentional or reckless omissions or falsities and that it is a "bare bones" affidavit, one so lacking in indicia of probable cause that belief in its existence is objectively unreasonable.

### B. Whether the Warrant Is Supported by Probable Cause

Kemp's Affidavit states only that evidence of the crimes of criminal homicide, possession of a controlled substance, and possession of paraphernalia "will be found at the location of 821 Lackey Circle, Gallatin, Sumner County, Tennessee," that Katherine Stone and

Josh Hunter had purchased four "points" of heroin for $100 the previous night from a "guy known . . . as 'Pops' or 'L'" and Tatiana Johnson, also known as "Titi," at 821 Lackey Circle. The Affidavit does not specify whether the purchase occurred outside or inside the residence and, if outside, whether anyone witnessed the seller come out of the house with the drugs. Investigation confirmed that electric power was turned on at 821 Lackey under the name of Tatiana Johnson, and a vehicle registered to Tatiana Johnson was parked in front of the residence. (Doc. No. 100-1, at 2.) The question is whether this information demonstrates a sufficiently close "nexus" between the drug transaction and the place to be searched.

The Sixth Circuit has recently recognized its own "struggle to provide guidance" to the district courts for the application of the nexus requirement to search warrant challenges. *United States v. Brown*, 828 F.3d 375, 382 (6th Cir. 2016); *see id.* at 381–82 ("The Fourth Amendment concern with protection from unreasonable intrusion in the home has resulted in a wide river of cases that courts have sought, sometimes in vain, to direct into tributaries that may be applied to comparable fact patterns. Multiple cases on the nexus requirement reveal our struggle to provide guidance for such a fact-bound legal determination."). The court there particularly emphasized the "fact-intensive nature of the probable cause inquiry" and noted, "as a general matter," that Sixth Circuit precedent teaches "that if the affidavit fails to include facts that directly connect the residence with the suspected drug dealing activity, or the evidence of this connection is unreliable, it cannot be inferred that drugs will be found in the defendant's home—even if the defendant is a known drug dealer." *Id.* at 384.

In *McPhearson*, the district court granted the defendant's motion to suppress and the appellate court affirmed, finding that the affidavit in that case "did no more than state that McPhearson, who resided at 228 Shelby Street, was arrested for a non-drug offense with a

quantity of crack cocaine on his person. These averments were insufficient to establish probable cause because they do not establish the requisite nexus between the place to be searched and the evidence to be sought." 469 F.3d at 524. That is because "[a] suspect's mere presence or arrest at a residence is too insignificant a connection with that residence to establish that relationship necessary to a finding of probable cause." *Id.* (quoting *United States v. Savoca*, 761 F.2d 292, 297 (6th Cir. 1985)) (internal quotation marks omitted).

The court noted that the inference that an individual arrested outside his residence with drugs in his pocket may have drugs and paraphernalia stored in his house may permissibly be drawn in some cases. *Id.* "But in all those cases, the affidavits contained an additional fact that permitted the magistrate to draw the inference that evidence of wrongdoing would be found in the defendants' homes—namely, the independently corroborated fact that the defendants were known drug dealers at the time the police sought to search their homes." *Id.* (citing *United States v. Miggins*, 302 F.3d 384, 393–94 (6th Cir. 2002); *United States v. Feliz*, 182 F.3d 82, 87–88 (1st Cir. 1999); *United States v. McClellan*, 165 F.3d 535, 546 (7th Cir. 1999)).

The Sixth Circuit likewise found that the affidavit submitted in support of a search warrant in *United States v. Higgins*, 557 F.3d 381 (6th Cir. 2009), failed to establish probable cause. There, the affidavit stated that police had conducted a traffic stop of a vehicle containing three individuals. A search incident to the arrest of the driver for driving under the influence yielded a "large amount of cocaine and cocaine base"—15 grams of powder cocaine and 26 grams of crack. *Id.* at 385. The driver, whose name was not stated in the affidavit but was disclosed to the judge, reported that he had bought the drugs from an individual named Oliver Higgins at a particular address. The two passengers, who conceded that they had ridden with the driver to pick up the drugs, independently corroborated that information. The driver also stated

that he had previously purchased cocaine from Higgins. The driver was transported to the address by police and confirmed the exact location of the drug transaction, and police officers confirmed that the motorcycle parked in front of the residence was registered to Higgins. A criminal background check revealed that Higgins had two prior felony drug convictions. *Id.*

A search warrant was issued on the strength of that information, and the search conducted pursuant to that warrant uncovered a large amount of drugs, drug paraphernalia, and firearms. Higgins was arrested on numerous drug- and firearm-related charges, and the district court denied his motion to suppress. Although the Sixth Circuit affirmed, finding that the *Leon* good-faith exception applied, it disagreed with the district court's determination that the warrant was supported by probable cause.

First, the court noted that it had previously held that, "where a known person, named to the magistrate, to whose reliability an officer attests with some detail, states that he has seen a particular crime and particular evidence, in the recent past, a neutral and detached magistrate may believe that evidence of a crime will be found." *Id.* at 389 (quoting *United States v. Allen*, 211 F.3d 970, 976 (6th Cir. 2000) (*en banc*)). However, while both cases involved an affidavit that was based on information provided to a police officer by an informant who was known to the affiant and whose name was disclosed to the magistrate, the court found that the facts in *Higgins* were different from those in *Allen* in "two critical respects." *Id.* First, the affiant in *Higgins* did not attest to the informant's credibility, and the facts in the affidavit itself were not independently sufficient to corroborate his statements. More specifically:

> The Supreme Court has held that "[a]dmissions of crime, like admissions against proprietary interests, carry their own indicia of credibility—sufficient at least to support a finding of probable cause to search." *United States v. Harris*, 403 U.S. 573, 583 (1971). However, when considering *Harris*, this court has held that "[a]n admission against penal interest . . . is a significant, *and sometimes conclusive*, reason for crediting the statements of an informant." *Armour v. Salisbury*, 492

F.2d 1032, 1035 (6th Cir. 1974) (emphasis added). Accordingly, the fact that the informant was known to the affiant and issuing magistrate and admitted a crime does not alone provide probable cause. In addition to providing scant information about the informant's reliability, the "corroboration" included in [the] affidavit does little to reinforce the informant's assertions. The affidavit states that the other passengers in the car confirmed the informant's statement, but it does not say whether they did so unprompted or if the police asked them whether the drugs had come from Higgins's apartment. The affidavit states that the police corroborated the fact that Higgins lived at the stated location, owned the motorcycle parked outside, and had a drug-related criminal history, but none of these facts supports the informant's assertion that he had purchased drugs from Higgins at this location the previous day.

Id. at 389–90.

And the second difference was that "this affidavit does not assert that the informant had been inside Higgins's apartment, that he had ever seen drugs or other evidence inside Higgins's apartment, or that he had seen any evidence of a crime other than the one that occurred when Higgins allegedly sold him drugs." *Id.* at 390. The court concluded that, "[w]ithout such an assertion, the affidavit fails to establish the necessary nexus between the place to be searched and the evidence sought." *Id.* (internal quotation marks and citation omitted).

Similarly, in *United States v. Neal*, 577 F. App'x 434 (6th Cir. 2014), the affidavit in question included substantial detail, obtained from an informant, about criminal activity at the place to be searched, but the court found that probable cause was lacking because (1) the affidavit did not establish the informant's "veracity, reliability, and basis of knowledge"; and (2), the police investigation did not establish sufficient corroborating evidence. The court appeared to conclude that the amount of information required to establish the reliability of an informant is inversely related to the amount of independent police corroboration required. "This Court has repeatedly held that an affidavit that furnishes details of an informant's track record of providing reliable tips to the affiant can substantiate the informant's credibility, such that other indicia of reliability may not be required when relying on the informant's statements. . . . However, where

the affidavit does not aver facts showing the relationship between the affiant and the informant, or detail the affiant's knowledge regarding the informant providing prior reliable tips that relate to the same type of crimes as the current tip concerns, this Court has generally found that other indicia of reliability must be present to substantiate the informant's statements." *Id.* at 442 (citations omitted). Thus, "[w]hile independent corroboration of a confidential informant's story is not a *sine qua non* to a finding of probable cause, in the absence of any indicia of the informant's reliability, courts insist that the affidavit contain substantial independent police corroboration." *Id.* at 440 (quoting *United States v. Coffee*, 434 F.3d 887, 893 (6th Cir. 2006)). On the other hand, "an affidavit containing statements of a 'known person, named to the magistrate, to whose reliability an officer attests with some detail, [and who] states that he has seen a particular crime and particular evidence, in the recent past,' may be sufficient for a finding of probable cause without independent police corroboration." *Id.* (quoting *Allen*, 211 F.3d at 976). "In short, where an affidavit substantially relies on hearsay statements provided by a confidential informant, probable cause for a warrant to issue depends on whether the reliability of the informant or sufficient independent police corroboration of the informant's statements can be found within the four corners of the affidavit." *Id.* (citations omitted).

Based on these cases, and particularly *Higgins*, the court finds that the Affidavit in this case does not provide the requisite nexus between the place to be search and the crimes being investigated. First, the Affidavit says nothing about the informants' reliability. Moreover, even if they are presumed to be reliable, and even assuming the truth of their statements to the police, as relayed in the Affidavit, the information they provided was not sufficient, standing alone, to establish probable cause, and the police officers' "corroborative" evidence lent no additional support. The only information provided by Hunter and Kristen, as set forth in the Affidavit, was

that they "went to purchase heroin from a guy known to [Hunter] as 'Pops' or 'L' and a girl known as 'Titi'" and that they had purchased drugs at 821 Lackey Circle. Although Katherine and Hunter indicated that Titi's real name was Tatiana Johnson, and Kemp independently corroborated that Johnson resided at 821 Lackey, the Affidavit does not actually state *who* transacted the purchase with Hunter and Katherine Stone or *where* the transaction occurred. There is no indication that Tatiana Johnson was a known drug dealer. As in *Higgins*, Kemp's "affidavit does not assert that the informant[s] had been inside [Johnson's] apartment, that [they] had ever seen drugs or other evidence inside [Johnson's] apartment, or that [they] had seen any evidence of a crime other than the one that occurred when [Johnson] allegedly sold [them] drugs." *Higgins*, 557 F.3d at 390. In short, the mere allegation that a crime occurred "at" a residence, without any additional details—who committed the crime, how, where—is insufficient to create the necessary nexus. *Accord id.* ("Without such an assertion, the affidavit fails to establish the necessary nexus between the place to be searched and the evidence sought.").

The government attempts to distinguish this case from those upon which the defendant relies by arguing that (1) the informants in this case were "eye witnesses" whose identity was known to the police officers and revealed to the magistrate and, as such, their statements are entitled to a presumption of reliability and veracity without independent corroboration; and (2) the informants both made statements against their penal interests by admitting to participation in the purchase of controlled substances, further supporting their credibility. As set forth above, however, the credibility of the informants in this case is not dispositive. Even assuming that they are credible, the information that they supplied is inadequate to supply probable cause.

Moreover, the cases cited by the United States are distinguishable, largely on the basis

that, in those cases, the sources named in the affidavits submitted in support of a search warrant had no connection with the criminal activities they reported, and they had actually been inside the residence and confirmed that the residence itself was being used in connection with the distribution of controlled substances. *See, e.g.*, *United States v. Hodge*, 714 F.3d 380, 382 (6th Cir. 2013) (where the source in that case was a "local resident" who was not alleged to be involved in the crimes being investigated or otherwise related to the investigation and provided detailed information about the criminal activities he had witnessed *inside* the defendant's residence); *United States v. Miller*, 314 F.3d 265, 270 (6th Cir. 2002) (where the informant was not alleged to be involved in the crimes or part of the investigation in any way, had witnessed the defendant's marijuana operation *inside* the defendant's mobile home on two different occasions while performing electrical and plumbing work for the defendant, and provided a sworn affidavit attesting to what he had seen); *United States v. Pelham*, 801 F.2d 875, 878 (6th Cir. 1986) (finding under the "totality of circumstances" that the informant was sufficiently reliable where he had been arrested after the police found six pounds of marijuana in his truck, and he reported that he had been inside the residence from which he purchased it within the past twenty-four hours and had witnessed the defendant inside the residence storing and selling marijuana).

In *Illinois v. Gates*, 462 U.S. at 230–31, the Supreme Court instructed that affidavits are to be evaluated in light of the "totality of the circumstances." Applying that test here, the court finds that the information provided by the Affidavit does not supply sufficient detail for a reasonable magistrate to conclude that there was "a fair probability that contraband or evidence of a crime" would be found inside the residence located at 821 Lackey Circle. *Id.* at 236. Nor did the reviewing magistrate have a "substantial basis" for concluding to the contrary. *Id.*

Because the Affidavit was not supported by probable cause, execution of the Warrant was

in violation of the Fourth Amendment, and the evidence uncovered in the search is subject to exclusion unless the *Leon* good-faith exception applies.

### C.     Application of the *Leon* Good-Faith Exception

The defendant argues that the good-faith exception does not save the Warrant in this case because (1) Investigator Kemp recklessly or intentionally omitted material facts from his Affidavit; and (2) the Affidavit is so "bare bones" that it is not eligible for the good-faith exception (*id.* at 15). The United States contests both of these assertions.

#### 1.     Whether the Affidavit Is Lacking in Indicia of Reliability

"An affidavit that is so lacking in indicia of probable cause that no reasonable officer would rely on the warrant has come to be known as a 'bare bones' affidavit." *United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017). "A bare bones affidavit is one that merely 'states suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge.'" *McPhearson*, 469 F.3d at 526 (citing *United States v. Weaver*, 99 F.3d 1372, 1378 (6th Cir.1996)). "Put more simply, a bare-bones affidavit is a conclusory affidavit, one that asserts 'only the affiant's belief that probable cause existed.'" *White*, 874 F.3d at 496 (quoting *United States v. Williams*, 224 F.3d 530, 533 (6th Cir. 2000)).

In *United States v. Carpenter*, 360 F.3d 591 (6th Cir. 2004), the Sixth Circuit found that the affidavit supporting the search warrant in that case failed to establish probable cause, because the connection between the narcotics activity and the residence was too week. The affidavit stated only that marijuana had been seen growing near the residence for which the warrant was sought and that there was a road between the plants and the residence. The court did not find the affidavit to be so bare bones that the good-faith exception did not apply, however. *See id.* at 595–

96 ("[T]he affidavit was not completely devoid of any nexus between the residence and the marijuana that the police observed. Rather, it noted both that the marijuana was growing 'near' the residence and that 'there is a road connecting' the residence and the marijuana plants.") (citing *United States v. Van Shutters*, 163 F.3d 331, 336 (6th Cir. 1998) (upholding a search where the affidavit underlying the warrant described the residence, the items sought, and the defendant's counterfeiting scheme, but connected the place to the illegal activity only by stating that the residence "was available" to the defendant); *United States v. Schultz*, 14 F.3d 1093, 1098 (6th Cir. 1994) (upholding a search of safe deposit boxes at a bank where the affidavit underlying the warrant connected the boxes and the defendant's trafficking in illegal drugs only by stating that the officer's training and experience led him to believe that evidence would be located there)). Likewise in *Higgins*, on facts that parallel those of this case in many ways, the Sixth Circuit found that, although probable cause was lacking, "the warrant contained a sufficient link between Higgins's home and drug activity such that a reasonably well-trained officer would not have known that the search was illegal." *Higgins*, 557 F.3d at 391.

Here, too, the Affidavit is not based on mere suspicion or belief and is not so conclusory that reliance on it was objectively unreasonable. It states that a young woman had died from what appeared to be a heroin overdose, and her boyfriend confessed to going with her to purchase heroin the night before. As set forth in the Affidavit, the witness provided the name of his contact for purchasing the heroin and showed police officers the location from which it was purchased. Police officers independently corroborated that the boyfriend's contact for the drug purchase actually resided at the address where the purchase occurred. Although the Affidavit lacks sufficient information to give rise to probable cause to search inside of the residence, it is "not completely devoid of any nexus" between the residence to be searched and the crimes being

investigated. *Carpenter*, 360 F.3d at 595.

## 2.      *The Omission of Material Information*

The defendant contends that defendant Kemp was "dishonest or reckless in preparing [his] affidavit" and, therefore, that the *Leon* good-faith exception does not apply. More specifically, the defendant argues that Kemp recklessly or intentionally omitted material facts, including that the drugs in question were purchased from outside the residence from someone other than Tatiana Johnson. In doing so, the defendant argues, Kemp "specifically excluded information which would on its face negate probable cause." (Doc. No. 100, at 11.) He further argues that Kemp's affidavit failed to mention Hunter's confession that he had used some of the heroin before he went to work and more of it during breaks while at work; failed to indicate that Kristen had lied to police during her interviews about her involvement in her sister's purchase of heroin the evening before; failed to mention that there were three other adult witnesses, besides Kristen and Hunter, but the other three were not willing to corroborate Kristen's and Hunter's stories and one actually invoked his Fifth Amendment rights; and also failed to mention that Hunter was a thief, having previously been charged with stealing a ring that belonged to Katherine and Kristen's mother. The defendant insists that Kemp deliberately omitted from the Affidavit "nexus-destroying facts" (Doc. No. 120, at 6) or recklessly failed to elicit specific information from Hunter and Katherine that would have clarified these facts. The defendant also argued, at the hearing, that the Affidavit's statement that certain evidence is "now located and may be found" at 821 Lackey is false and, at a minimum, falsely implied that the drug purchase took place inside the residence.

"Just as the *Leon* good faith exception does not apply to save a 'bare bones' affidavit, it also cannot save an affidavit that contains knowing or reckless falsities." *United States v. West*,

520 F.3d 604, 612 (6th Cir. 2008). The concept of "falsity" includes the knowing or reckless omission of material information. *See United States v. Archibald*, No. 3:10-CR-00064, 2011 WL 13186527, at \*5 (M.D. Tenn. Apr. 13, 2011) ("Indeed, *West* fully indicates that it is entirely within the court's authority to make a considered review of the entire record, and, if the court finds that the affiant's omissions evinced a reckless disregard for the truth, the court should conclude that 'good faith' cannot save the evidence at issue.").

In this case, while it is clear that the Affidavit could and should have supplied additional details and that the police officers likely could and should have conducted a more thorough investigation prior to seeking a Warrant, the court held a *Franks* hearing in this case and, based in large part upon Investigator Kemp's live testimony in court, finds that the omissions in this case were not knowing or reckless. The court credits Kemp's testimony that he did not know at the time he drafted his Affidavit that the heroin purchase had occurred outside 821 Lackey rather than inside the residence. The record also does not reflect that he was actually aware that the individual who transacted the purchase at the residence was not Tatiana Johnson herself but, instead, a man who identified himself as "Titi's baby-daddy." Further, in light of the seriousness of the crime at issue—the suspected sale of a "bad batch" of heroin which had already resulted in a death—and the urgency of ensuring that the source of such drugs was shut down, Kemp's hurry to obtain the warrant and his failure to obtain and supply sufficient details to give rise to probable cause is understandable and not the product of bad faith. There is simply no evidence in the record from which the court could conclude that the omissions were intentional or reckless.

The other factual omissions upon which the defendant relies—Kristen's changing her story, Josh Hunter's admitted use some of the heroin, and the existence of other witnesses—were not material facts the disclosure of which would have affected the probable cause analysis. And

there is no indication in the record that Kemp was aware of Josh Hunter's criminal history of a misdemeanor theft at the time he drafted the Affidavit. Finally, although the existence of the boilerplate language regarding the presence of evidence expected to be located at the residence contributes to the court's conclusion that the Affidavit did not supply probable cause for the issuance of a warrant, that language does not constitute a material or intentional falsehood the inclusion of which in the Affidavit is sufficient to invalidate it under *Leon*.

## II. ORDER

Although the Warrant was not supported by probable cause, the court nonetheless finds that the *Leon* good faith exception applies. Accordingly, as explained herein, the defendant's Motion to Suppress (Doc. No. 100) is **DENIED**.

It is so ORDERED.

ENTER this 15th day of May 2018.

_____

ALETA A. TRAUGER
United States District Judge