UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.  ) | No.  3:17-00132 |
| ) | Judge Trauger |
| ) | |
| DAMION ANDERSON ) | |

**MOTION FOR RECONSIDERATION
OF DENIAL OF MOTION TO SUPPRESS**

Damion Anderson, by and through counsel, hereby moves this Honorable Court to reconsider its finding that the *"Leon* good-faith" exception excuses the Fourth Amendment violation arising from the search of the home located at 821 Lackey Circle.  At the time the Memorandum Opinion was rendered, the Court did not have the benefit of a transcript of the proceeding because neither party had ordered it.  Having thereafter obtained a transcript of the proceeding and examined it in conjunction with the exhibits introduced into evidence, undersigned counsel would respectfully show the Court that the record compels a reversal of the Court's *Leon* ruling.

**Analysis**

As undersigned counsel understands the Court's Opinion, the most crucial omissions from the search warrant affidavit were the fact that (1) the drug transaction occurred outside the residence rather than inside, and (2) the transaction was conducted by someone other than Tatiana Johnson, the full-time resident of that apartment.  (D/E 146 at 17).  The Court found, however that the omissions were not done in bad faith because the Court credited Investigator "Kemp's testimony that he did not know at the time he drafted his Affidavit that the heroin purchase occurred outside the residence located at 821 Lackey Circle rather than inside the residence;" and because the record "did

1

not reflect that he was actually aware that the individual who transacted the purchase at the residence was not Tatiana Johnson herself but, instead, a man who identified himself as 'Titi's baby-daddy.'" (D/E 146 at 17). Mr. Kemp's testimony on each of those issues, however, is refuted by other evidence in the record.

**A. Kemp knew at the time he drafted his affidavit that (1) the purchase occurred outside the residence and (2) that the transaction involved someone other than Tatiana Johnson.**

In his testimony on direct examination regarding his knowledge of the location of the transaction based on pre-search interviews, Mr. Kemp's initial answer, without interjection of another question, evolved from it "wasn't discussed," to, "Mr. Anderson had came from that house and delivered the drugs," then, "Let me– let me back up. I misspoke there. Just that they had got the drugs from there at that time." (D/E 150, Tr. at 50).

To the Court's question, "You didn't ask him, did you go inside the house, did you go to the door? You didn't ask him any of those questions?," he replied "At that point, no." To the Court's next question, "Why? Why not?," he replied, "Well, I had several people to investigate. I was trying to get everything done, a lot of things going on. Still have another person to bring over." (D/E 150, Tr. at 51). To the prosecutor's leading follow-up question, Mr. Kemp affirmed that he did not know that the transaction was conducted by an individual outside the house until after he had signed the search warrant affidavit. (D/E 150, Tr. at 52).

Mr. Kemp's answers to the prosecutor's questions and to the Court's questions are contradicted by the investigation reports admitted into evidence. Specifically, Mr. Kemp's own report, entitled "Joshua Hunter and Kristen Stone Interviews; S/W drafted for 821 Lackey Circle,"

2

(D/E 100-2, Hearing Exhibit 2, at 16), documents his observation and participation in those interviews:

> On 3-23-17 I responded back to the Annex to assist/observe Inv. Jones and Inv. Troutt's interviews with Joshua Hunter and Kristen Stone. Joshua's statement was mush (sic) the same while still on scene. He stated that him, Katherine, Kristen, and two small children travelled (sic) in Kristen's blue Nissan to the "Northside" of town and purchased heroin from "Titi." Joshua would later state that a male served him and told him that he was "Titi's" "baby daddy." He stated he purchased 4 "points" at $25 each for a total of $100.
>
> Kristen at first lied to Inv. Jones about the drug transaction. I then re-confirmed with Joshua that Kristen was with them. I then confronted Kristen with this information. It was at this point that she acknowledged she was present. She then gave matching information as to who went, what they were driving, and what was purchased during the transaction....

Hearing Ex. 2, D/E 100-2, pg. 16.

Contrary to his testimony that he was, essentially, involved with investigating "other people," Mr. Kemp's own report reflected his deliberate involvement in Mr. Hunter's interview, even to the point that he was able to confront Kristen's apparent lies.

The interview of Joshua Hunter that Mr. Kemp reported having assisted in or observed, was conducted by Investigator Troutt. Mr. Troutt noted in his report that the interview was "video/audio taped," and summarized Hunter's statements, as follows:

> During the interview, Mr. Hunter advised that the (sic) Katherine Stone (deceased) was his girlfriend. Katherine Stone and Mr. Hunter share a child together. On the night prior, Katherine Stone and Mr. Hunter, along with their child were driven to "TiTi's" house by Kristen Stone to purchase illegal narcotics. Mr. Hunter was introduced to Ms. Johnson by Patrick Williams, a roommate of Mr. Hunter's. Ms. Johnson's residence was later identified as 821 Lackey Circle Gallatin, tn 37066. *Mr. Hunter advised that Ms Johnson's "baby-daddy" served him with the illegal narcotics outside the residence....*
>
> *Mr. Hunter agreed to take a ride with Inv. Kemp and myself to point out the residence that (sic) he purchased the illegal narcotics. During the ride, Mr. Hunter*

3

> *again confirmed that Ms. Johnson's "baby-daddy" conducted the exchange of money for the illegal narcotics.*

Hearing Exhibit 2, D/E 100-2, pg. 12 (emphasis added).

At the end of such report, Mr. Troutt included the closing statement: "Based on this information, Inv. Kemp obtained a search warrant for the address of 821 Lackey Circle, Gallatin, TN 37066. *Id.*, pg. 13.

On cross-examination, Mr. Kemp testified to the purpose of the investigative reports that were collected and presented as Exhibit 2 to the hearing and the motion to suppress. He stated that the reports, which were based on recorded interviews of the witnesses, should be accurate summaries of everything of importance that was said in the interviews. (D/E 150, Tr. at 84-85). Notably, none of the reports refers to the inside of the Lackey residence, yet they detail events as insignificant as the Walmart shopping trip that preceded the drug transaction outside the home.

The reports generated by Mr. Kemp and Mr. Troutt establish that Mr. Kemp was present when Joshua Hunter stated that he purchased the drugs from an individual other than Ms. Johnson. (Exhibit 2, D/E 100-2, pgs. 12 ("Myself and Inv Troutt then loaded up Joshua and had him take us to where the heroin was purchased."–Kemp) and 16 (Mr. Hunter agreed to take a ride with Inv. Kemp and myself to point out the residence that he purchased the illegal narcotics. During the ride, Mr. Hunter confirmed again that Ms. Johnson's 'baby-daddy' conducted the exchange of money for the illegal narcotics."–Troutt). Mr. Kemp's testimony that he did not know before seeking the search warrant that the drugs were purchased from someone other than Tatiana Johnson is refuted by the reports he testified should be accurate.

Mr. Anderson requests that the Court review the now-available transcript of Mr. Kemp's

4

testimony in conjunction with the reports in Exhibit 2 cited herein. He submits that such review will demonstrate that the "*Leon* good-faith" exception does not apply because Mr Kemp's testimony to a lack of knowledge as to the location of the transaction and the participant in the transaction was false.

**B. Mr. Kemp's Testimony Demonstrated Deliberate Ignorance of Facts Which Rendered the Search of 821 Lackey Circle Unconstitutional.**

Mr. Kemp testified that he attended training conducted by both lawyers and other police officers, and that such training at times addressed search warrants. (Tr., D/E 150 at 73). He admitted that he understood the principle of "nexus," and he acknowledged that he was familiar with the principles that were discussed by counsel and the Court before his testimony began. *Id.* at 74-75. One of the cases discussed while he was in the courtroom was *United States v. Higgins*, 557 F.3d 381 (6th Cir. 2009), a case in which the court held that nexus was not established by an affidavit which did not assert that the informant had been inside the house at issue. As the Sixth Circuit noted, *Leon* good-faith saved the warrant nonetheless because, at that time – in 2009 – "this court's precedents are not so clear as to make it 'entirely unreasonable' to find probable cause based on such an affidavit; and there has been no showing that the warrant was so obviously deficient that official reliance on it was objectively unreasonable." *Id.* at 2009.

Presumably, Mr. Kemp's training regarding "nexus" for search warrants while serving as a Gallatin Police Department investigator considered Sixth Circuit cases dating back to 2009, including those that make clear that nexus cannot be established for Fourth Amendment purposes unless an affidavit asserts that the informant had "been inside [the home], that he had ever seen drugs or other evidence inside [the home], or that he had seen any evidence of a crime other than the one

5

that occurred when [the resident] allegedly sold him drugs." *Higgins*, 557 F.3d at 390. Certainly Mr. Kemp acknowledged having learned about "nexus" and a familiarity with Fourth Amendment legal standards. And, with the passage of time since *Higgins* was decided in 2009, Sixth Circuit precedent is now clear, and *Leon* does not save a warrant on the basis of an officer's ignorance of the law.

Mr. Kemp appeared to have sought to save this warrant by testifying that he did not inquire into the facts that would determine whether nexus could be established as posed by this Court ("You didn't ask him, did you go inside the house, did you go to the door? You didn't ask him any of those questions?"). Had he asked those questions before seeking the warrant, Mr. Kemp would have known that he could not establish probable cause to search 821 Lackey at that time. Instead of asking a question ("Did you go inside the house?"), the answer to which would have prevented him from obtaining a warrant, he drafted an ambiguous description of the address "as where they had purchased the heroin the previous night" and inserted it below what may be boilerplate language but which is unambiguously unsupported by any evidence at the time it was asserted:: "The Affiant further testifies that the said evidence is now located and may be found in possession of said persons or on said premises located at 821 Lackey Circle, Gallatin, Sumner County, Tennessee *and in the premises used and occupied by the occupants of this residence*...." (Ex. 1, D/E 100-1, pg. 2) (emphasis added). By his deliberate ignorance, Mr. Kemp was able to blend an ambiguous phrase with boilerplate language to suggest that "where they had purchased the heroin" was "in the premises." His ignorance was deliberate and intentional, and the good-faith exception does not apply.

6

### C. Concern that Others Might Purchase Tainted Heroin Does Not Excuse the Violation of the Fourth Amendment

The Court noted that Mr. Kemp's concern that others might buy tainted heroin which caused him to "hurry to obtain the warrant and his failure to obtain and supply sufficient details to give rise to probable cause is understandable and not the product of bad faith." (D/E 146 at 22). However, at the time the warrant was sought, had he provided all of the details known to each of the investigators, he still could not have supplied "sufficient details to give rise to probable cause" because no one had been inside the home located at 821 Lackey Circle. Rather than violate the Fourth Amendment, Mr. Kemp could have addressed his concern by establishing surveillance on the house and intercepting any potential buyer who arrived at the property. Declining to suppress evidence collected in violation of the Fourth Amendment due to the officer's stated noble purpose only serves to encourage such manner of violations in the future–in direct contravention of the exclusionary rule, whose "prime purpose is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures.'" (D/E 146, Opinion, quoting *Linkletter v. Walker*, 381 U.S. 618, 637 (1965)).

### D. The Material Misrepresentations in the Affidavit Exclude it from the *Leon* Good-Faith Exception to the Exclusionary Rule

Based on a careful reading of the transcript and the investigation reports which demonstrated Mr. Kemp's collection of information before seeking the search warrant, Mr. Anderson submits that the good-faith exception cannot apply. In *United States v. Abernathy*, 843 F.3d 243 (6th Cir. 2016), the Sixth Circuit summarized scenarios in which the *Leon* good-faith exception does not apply. Particularly pertinent to this case, the court acknowledged *United States v. Hammond*, 351 F.3d 765,

773-74 (6th Cir. 2003) (declining to apply good faith exception where officer's affidavit contained 'falsehoods and half-truths'). *Abernathy*, 351 F.3d at 257. Here, Mr. Kemp's affidavit contained the "falsehood and half-truth" that suggested the informant had been inside Tatiana Johnson's house. Similarly, the Sixth Circuit declined "to apply good faith exception where the officer violated *Franks* by 'purposefully with[holding] information when he prepared his affidavit.'" *Id., quoting United States v. West*, 520 F.3d 604, 612 (6th Cir. 2008). As demonstrated by Mr. Kemp's own report (D/E 100-2 at 16) and corroborated by Mr. Troutt's report (D/E 100-2 at 12), Mr. Kemp withheld the crucial information that the person who engaged in the transaction was someone other than Tatiana Johnson. Indeed, as argued in Section A above, reading Troutt's and Kemp's reports together (D/E 100-2 at 12, 16), Kemp was aware before seeking the search warrant that Mr. Hunter said the sale occurred outside the house. Mr. Kemp may have *testified* to an absence of bad faith, but the totality of the circumstances demonstrates otherwise.

## Conclusion

Mr. Anderson respectfully requests that the Court review the now-available transcript in conjunction with the investigation reports cited herein. As described herein, he submits that Mr. Kemp prepared his affidavit with reckless disregard for the truth–truths which he actually knew but withheld, or, to paraphrase his testimony, truths to which he was deliberately ignorant. The evidence should be suppressed.

Respectfully submitted,

s/Kathleen G. Morris
Kathleen G. Morris
42 Rutledge Street, 1st Floor
Nashville, TN 37210
615-242-3200
Morris@KMorris.net

**Certificate of Service**

I hereby certify that a true and correct copy of the foregoing was filed electronically through the Court's ecf system, which system generated an email notification thereof to Assistant United States Attorney Amanda Klopf, 110 Ninth Avenue South, Suite A-961, Nashville, TN 37203, this 12th day of May, 2018.

s/Kathleen G. Morris
Kathleen G. Morris