IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Crim. No. 3:17-cr-00132-2 |
| | ) | Judge Aleta A. Trauger |
| | ) | |
| DAMION ANDERSON | ) | |

**MEMORANDUM AND ORDER**

Before the court is defendant Damion Anderson's Motion for Reconsideration of Denial of Motion to Suppress (Doc. No. 152) and request for an evidentiary hearing and reopening of the proof on his Motion to Suppress Evidence (Doc. No. 175). For the reasons set forth herein, the court will reopen the proof to consider the new evidence submitted by both parties, deny the request for a second evidentiary hearing, and grant the Motion for Reconsideration.

**I.      Introduction**

In the Motion to Suppress (Doc. No. 100), Damion Anderson sought to suppress evidence seized, pursuant to a search warrant, from a home he was visiting, located at 821 Lackey Circle in Gallatin, Tennessee ("the residence"). In ruling on that motion, the court found that the Affidavit submitted by Investigator James Kemp of the Gallatin Police Department in support of his application for a search warrant was not supported by probable cause, as it did not supply sufficient detail for a reasonable magistrate to conclude that there was a "fair probability that contraband or evidence of a crime," *Illinois v. Gates*, 462 U.S. 213, 236 (1983), would be found inside the residence. As a result, the execution of the search warrant violated the defendant's rights under the Fourth Amendment. The court nonetheless denied the Motion to Suppress based

on the good-faith exception to the exclusionary rule recognized in *United States v. Leon*, which held that, if the evidence in question was "obtained in objectively reasonable reliance" on the "subsequently invalidated search warrant," it should not be suppressed. 468 U.S. 897. 922 (1984). In reaching that determination, the court rejected the defendant's argument that two of the four situations that have been recognized as warranting an exception to the good-faith exception, summarized in *United States v. McPhearson*, 469 F.3d 518 (6th Cir. 2006), were present in this case. Specifically, the court held that: (1) Kemp's Affidavit did not contain knowing or reckless material falsities or omissions; and (2) the Affidavit was not "so lacking in indicia of probable cause that a belief in its existence is objectively unreasonable." *See United States v. Anderson*, No. 3:17-cr-00132-2, 2018 WL 2219035, at *10 (M.D. Tenn. May, 15, 2018) (Doc. No. 146) (quoting *McPhearson*, 469 F.3d at 525).

Because neither party had ordered a transcript of the hearing at that point, the court's determination that Kemp's Affidavit did not contain knowing or reckless falsities was based largely on the court's notes and recollection of the hearing testimony. Following issuance of the order denying the suppression motion, the defendant ordered a copy of the transcript. In the Motion for Reconsideration, the defendant now submits that the transcript of the proceeding, examined in conjunction with the exhibits introduced into evidence at the hearing, compels reversal of the court's original conclusion that the *Leon* good-faith exception required denial of the Motion to Suppress. In addition, following the filing of the Motion for Reconsideration, both the government and the defendant submitted additional discovery materials that had not been made available to the defendant—or the court—prior to the hearing. The government submitted an audio-video file of an interview of Josh Hunter by Investigator Brandon Troutt. The defendant submitted an audio file of Investigator Kemp's initial interview of Hunter that took place at the home he shared with his girlfriend, Katherine Stone, whose death by overdose precipitated this

prosecution. The parties ask the court to take this new evidence into consideration in ruling on the defendant's Motion for Reconsideration.

In addressing this motion, the court has considered the hearing transcript, hearing exhibits, the audio and video recordings of witness interviews submitted by the parties, and the parties' arguments. Based on the record as a whole, the court now finds that Kemp's Affidavit contained material, knowing and reckless falsities or omissions and, therefore, that the *Leon* good-faith exception does not apply. The court will vacate that part of the previous Memorandum and Order finding to the contrary and grant the Motion to Suppress.

## II.     Standard of Review

The district courts have inherent authority under both the common law and Rule 54(b) of the Federal Rules of Civil Procedure to reconsider interlocutory orders and to reopen any part of a case before entry of a final judgment. *In re Saffady*, 524 F.3d 799, 803 (6th Cir. 2008); *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004). This authority allows district courts "to afford such relief from [interlocutory orders] as justice requires." *Rodriguez*, 89 F. App'x at 959 (citations omitted). "Traditionally, courts will find justification for reconsidering interlocutory orders when there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice." *Id.*

## III.    The Motion for Reconsideration

The court's analysis of the Motion for Reconsideration presumes familiarity with the summary of the factual and procedural background, as well as the legal standards governing analysis of alleged Fourth Amendment violations, laid out in the original Memorandum and Order ("May 2018 Order") denying the Motion to Suppress. *United States v. Anderson*, 2018

WL 2219035 (Doc. No. 146). The factual findings stated there are amended by the additional facts referenced herein, and the court adopts and reconfirms its previous determinations that (1) execution of the search warrant violated the Fourth Amendment, but (2) Kemp's Affidavit was not "so lacking in indicia of probable cause that a belief in its existence is objectively unreasonable." *Anderson*, 2018 WL 2219035, at *10 (quoting *McPhearson*, 469 F.3d at 525).

In concluding that the search violated the Fourth Amendment, the court noted two crucial omissions from the Affidavit Kemp submitted in support of the search warrant: "[T]he Affidavit does not actually state *who* transacted the purchase with Hunter and Katherine Stone or *where* the transaction occurred." *Id.* at *9. On the basis of these omissions, the court found that the warrant did not create a sufficient nexus between the place to be searched and the crimes being investigated:

> First, the Affidavit says nothing about the informants' reliability. Moreover, even if they are presumed to be reliable, and even assuming the truth of their statements to the police, as relayed in the Affidavit, the information they provided was not sufficient, standing alone, to establish probable cause, and the police officers' "corroborative" evidence lent no additional support. The only information provided by Hunter and Kristen [Stone, Katherine's sister], as set forth in the Affidavit, was that they "went to purchase heroin from a guy known to [Hunter] as 'Pops' or 'L' and a girl known as 'Titi'" and that they had purchased drugs at 821 Lackey Circle. Although [Kristen] and Hunter indicated that Titi's real name was Tatiana Johnson, and Kemp independently corroborated that Johnson resided at 821 Lackey, the Affidavit does not actually state who transacted the purchase with Hunter and Katherine Stone or where the transaction occurred. There is no indication that Tatiana Johnson was a known drug dealer. As in [*United States v. Higgins*, 557 F.3d 381 (6th Cir. 2009)], Kemp's "affidavit does not assert that the informant[s] had been inside [Johnson's] apartment, that [they] had ever seen drugs or other evidence inside [Johnson's] apartment, or that [they] had seen any evidence of a crime other than the one that occurred when [Johnson] allegedly sold [them] drugs." *Higgins*, 557 F.3d at 390. In short, the mere allegation that a crime occurred "at" a residence, without any additional details—who committed the crime, how, where—is insufficient to create the necessary nexus. *Accord id.* ("Without such an assertion, the affidavit fails to establish the necessary nexus between the place to be searched and the evidence sought.").

(Doc. No. 146, at 16–17.) Evaluating the Affidavit in light of the "totality of circumstances," as the Supreme Court instructed in *Illinois v. Gates*, 462 U.S. at 230–31, the court determined that "the information provided by the Affidavit does not supply sufficient detail for a reasonable magistrate to conclude that there was 'a fair probability that contraband or evidence of a crime' would be found inside the residence. . . . Nor did the reviewing magistrate have a 'substantial basis' for concluding to the contrary." (Doc. No. 146, at 18 (quoting *Gates*, 462 U.S. at 236).) The court held that, because the warrant was not supported by probable cause, its execution resulted in a violation of the Fourth Amendment. *Leon*, 468 U.S. at 900.

When a Fourth Amendment violation has occurred, the typical remedy is to exclude the evidence obtained in the illegal search. *See Illinois v. Krull*, 480 U.S. 340, 347 (1987) ("When evidence is obtained in violation of the Fourth Amendment, the judicially developed exclusionary rule usually precludes its use in a criminal proceeding against the victim of the illegal search and seizure."). Under *Leon*, however, if the evidence in question was "obtained in objectively reasonable reliance" on the "subsequently invalidated search warrant," it should not be suppressed. 468 U.S. at 922. But that rule, too, is subject to exceptions. Among other situations, the so-called *Leon* good-faith exception does not apply "when the affidavit supporting the search warrant contains a knowing or reckless falsity" or "when the affidavit is so lacking in indicia of probable cause that a belief in its existence is objectively unreasonable." *McPhearson*, 469 F.3d at 525 (6th Cir. 2006).

As indicated above, the court rejected the defendant's argument that the *Leon* good-faith exception did not apply because the Affidavit in support of the search warrant was a "bare bones" affidavit, so lacking in indicia of probable cause that belief in its existence was objectively unreasonable. The court found that the Affidavit was "not based on mere suspicion or

belief and [was] not so conclusory that reliance on it was objectively unreasonable." (Doc. No. 146, at 20.) The defendant does not challenge that conclusion in his Motion for Reconsideration.

The court also rejected the defendant's argument that the Affidavit did not contain knowing or intentional omissions. (Doc. No. 146, at 20.) The court stated:

> [W]hile it is clear that the Affidavit could and should have supplied additional details and that the police officers likely could and should have conducted a more thorough investigation prior to seeking a Warrant, the court held a *Franks* hearing in this case and, based in large part upon Investigator Kemp's live testimony in court, finds that the omissions in this case were not knowing or reckless. The court credits Kemp's testimony that he did not know at the time he drafted his Affidavit that *the heroin purchase had occurred outside [the residence] rather than inside the residence. The record also does not reflect that he was actually aware that the individual who transacted the purchase at the residence was not Tatiana Johnson herself but, instead, a man who identified himself as "Titi's baby-daddy."*

(*Id.* at 22 (emphasis added.)[1] Based on this conclusion, the court applied the *Leon* good-faith exception and denied the Motion to Suppress.

It is this conclusion that the defendant challenges in his Motion for Reconsideration. Based on the transcript of the hearing, which was not available when the court issued its ruling, exhibits submitted during the hearing, and the additional evidence that was not available to the defendant when he filed the Motion to Suppress, the defendant argues that reconsideration of the denial of his Motion to Suppress is necessary to permit consideration of the additional evidence and to correct a clear error. He maintains that the available evidence clearly establishes that Investigator Kemp knew when he drafted the Affidavit that the drug purchase had occurred outside the residence, that the informants never went inside the residence, and that the transaction involved someone other than Tatiana Johnson. (Doc. No. 152, at 2.) Alternatively, the defendant contends that Kemp's failure to ascertain where the drug transaction occurred, and

---

[1] The court found that the other purported "omissions" to which the defendant referred in his motion were not material.

from whom, prior to drafting the Affidavit and obtaining the warrant demonstrates a deliberate ignorance of facts that renders the search unconstitutional. In response to the court's suggestion that the urgency of the situation justified, to some degree, Kemp's failure to conduct a more thorough investigation before obtaining a search warrant, the defendant argues that "[d]eclining to suppress evidence collected in violation of the Fourth Amendment due to the officer's stated noble purpose only serves to encourage such manner of violations in the future—in direct contravention of the exclusionary rule, whose 'prime purpose is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures.'" (Doc. No. 152, at 7 (citing *Linkletter v. Walker*, 381 U.S. 618, 636–37 (1965)).) The defendant maintains, in sum, that material misrepresentations in the Affidavit exclude it from the *Leon* good-faith exception to the exclusionary rule and that the court should grant the Motion to Suppress.

In its Response, the government argues that: (1) the defendant points to no facts in the record that suggest that Kemp actually knew where the drug transaction took place when he drafted the Affidavit; (2) Kemp, contrary to the defendant's assertion, actually testified that Hunter had told him that the drug purchase was from a person who "identified himself as Tatiana's baby daddy" (Doc. No. 165, at 3 (citing Hr'g Tr., Doc. No. 150, at 52)) and that this point is not actually contradicted by the Affidavit—in other words, the government asserts, there was no material misrepresentation; and (3) the seriousness of the crime—the sale of heroin laced with fentanyl that resulted in at least one death—and the urgency of the need to shut down the source of those drugs outweighs the deterrent value of suppression in this case.

In his Reply (Doc. No. 175), the defendant disputes the government's characterization of Kemp's testimony and, further, argues that a recording of Kemp's initial interview of Josh

Hunter, produced by the government after the court ruled on the Motion to Suppress, establishes that Hunter told Kemp that Titi's "baby daddy," a man known to him only as "L" was the "one that came out" to sell the drugs, thus establishing that the Affidavit was premised upon knowing, intentional, or reckless falsehoods.

**IV.     Analysis**

The question before the court is whether Investigator Kemp recklessly or intentionally misrepresented or omitted material facts from his Affidavit. As relevant here, the Affidavit included the following summary as the basis for issuance of the Warrant:

> Your Affiant is currently a certified law enforcement officer with the Gallatin Police Department and is currently assigned to the Criminal Investigations Division. Your Affiant has worked in the field of law enforcement for 11 years [and] has been to several specialized training schools involving the investigation, arrest, and prosecution of criminals engaged in the entire gambit of criminal activity. . . .
>
> Your affiant interviewed Josh [Hunter]. Josh admitted that him, [Katherine] Stone, and Stone's sister, Kristen, went to purchase heroin the previous night from a guy known to him as "Pops" or "L" and a girl known at "Titi." Kristen stated that "Titi's" real name is Tatiana Johnson. I located a Tatiana Johnson in RMS and pulled her Tennessee driver's license and picture. The address listed on the DL is 821 Lackey Circle in Gallatin, Sumner County. I showed the DL photograph to both Josh and Kristen independently. Both identified the person in the photo as "Titi." Josh and Kristen then each pointed out independently 821 Lackey Circle as where they had purchased the heroin at the previous night. In front of 821 Lackey Circle was a 4D sedan bearing Tennessee tag 5E99M3. I ran this plate through dispatch and found it returned to Tatiana Johnson. I then called Gallatin Electric. They advised the electric was turned on at 821 Lackey Circle under the name of Tatiana Johnson.
>
> Josh stated that he and Katherine bought "4 points" of heroin from this house for $100.00. He stated that Katherine was given two points and he took two points. He stated that Katherine then ingested the heroin by snorting it shortly after they purchased it.
>
> Your affiant is seeking a search warrant for the house and property of **821 Lackey Circle Gallatin, Sumner County, Tennessee** for the above mentioned evidence. Your affiant feels that such evidence found on the above mentioned property will directly assist in the investigation and/or prosecution of T.C.A. Section 39-13-201 Criminal Homicide, T.C.A. 39-17-417 Possession of a Controlled Substance, and

T.C.A. Possession of Paraphernalia.

(Doc. No. 100-1, at 2.)

The defendant argued in the original Motion to Suppress that Kemp recklessly or intentionally omitted from the Affidavit the material facts that the heroin was purchased from outside the residence rather than inside and from "L" rather than from Tatiana Johnson. The defendant also argued at the hearing that the Affidavit's statement that certain evidence is "now located and may be found" at the residence was false or, at a minimum, falsely implied that the drug purchase took place inside the residence.

As indicated above, the *Leon* good-faith exception "cannot save an affidavit that contains knowing or reckless falsities." *United States v. West*, 520 F.3d 604, 612 (6th Cir. 2008). The concept of "falsity" includes the knowing or reckless omission of material information. *See United States v. Archibald*, No. 3:10-CR-00064, 2011 WL 13186527, at *5 (M.D. Tenn. Apr. 13, 2011) ("Indeed, *West* fully indicates that it is entirely within the court's authority to make a considered review of the entire record, and, if the court finds that the affiant's omissions evinced a reckless disregard for the truth, the court should conclude that 'good faith' cannot save the evidence at issue.").

The court's decision to deny the Motion to Suppress was based largely upon Investigator Kemp's live testimony in court that he did not know when he drafted the Affidavit that the drug purchase occurred outside, rather than inside, the residence, that the omission of that information was "not knowing or reckless" and, likewise, that the record did not reflect that Kemp "was actually aware that the individual who transacted the purchase at the residence was not Tatiana Johnson herself but, instead, a man who identified himself as 'Titi's baby-daddy.'" (Doc. No. 146, at 22.)

The information highlighted by the defendant in the Motion for Reconsideration calls

these conclusions into question. The court has reviewed the transcript of the hearing, reconsidered the exhibits introduced during the hearing, and considered for the first time the new evidence submitted by the parties. In the Affidavit, as quoted above, Kemp stated that Hunter told him that he and Katherine Stone had purchased heroin "from a guy known to him as 'Pops' or 'L' and a girl known at 'Titi'" and that they purchased the drugs "from this house" at 821 Lackey. (Doc. No. 100-1, at 2.) Similarly, Kemp testified at the *Franks* hearing that, when he arrived at the house at which Katherine Stone had died, he interviewed Hunter, who told him that they had "purchased drugs from a person he identified as Titi." (Doc. No. 150, at 47.) Hunter also "talked about an individual named Pops or L." (*Id.*) According to Kemp, this interview was "brief," and Hunter was then transported to the Criminal Investigation Division building for a lengthier interview by Investigator Troutt, during which Kemp questioned Hunter again only "briefly." (*Id.* at 47–48.) Kemp specifically recalled Hunter's telling him that he and Katherine had bought four points of heroin "from this house"—Titi's or Tatiana Johnson's house—for $100. "He said that specifically in the interview at the annex." (*Id.* at 48.) Later, Troutt and Kemp together drove with Hunter for him to show them where he had purchased the drugs, and Hunter directed them to 821 Lackey Circle. According to Kemp, "[e]xactly where the deal had taken place wasn't discussed. Just that . . . Mr. Anderson[2] had come from that house and delivered the drugs." (*Id.* at 50.) Kemp then hastily corrected himself: "[L]et me back up. I misspoke there. Just that they had got the drugs from [the house] at the time." (*Id.*)

The court pressed him: "Wait, let's go back here. What exactly did [Hunter] say about getting the drugs in that location?" (*Id.*) Kemp replied: "Sure. Only that the narcotics came from

---

[2] It is unclear to which Mr. Anderson Kemp was referring. The defendant here is Damion Anderson, but a co-defendant named Leon Anderson was also charged, and has pleaded guilty, in this case.

that house. The only person he'd identified at that point was Titi, Tatiana Johnson, and a guy named Pops. But more specifically Titi, Tatiana Johnson. That was his point of contact." (*Id.* at 51.) The court asked Kemp if he had asked Hunter whether he went to the door or went inside the house, and Kemp stated that he did not, at that point, because he "had several people to investigate" and "a lot of things going on." (*Id.*) He claimed he only later learned that "an individual had come out of that house and that the deal had taken place outside of the house." (*Id.*) He stated specifically, under questioning from the government, that, "[a]t the time that [he] signed this . . . affidavit, [he] did not know that extra detail that the individual had actually exited the house." (*Id.* at 52.)

Based on other evidence already in the record at the time, Kemp's hasty self-correction, his vague response to the question of why he had not asked Hunter for additional details regarding the transaction, and his admitted familiarity with the operative Sixth Circuit "nexus" standard for obtaining a search warrant (*see* Doc. No. 150, at 73–75), the court had some hesitation in crediting Kemp's testimony that he did not know until after he obtained the search warrant that someone other than Johnson had sold the drugs to Hunter and Stone or that that person had come out of the house to conduct the sale. The court nonetheless did so, largely because there was no other evidence in the record to refute it.

The defendant has now pointed to other evidence in the record that expressly refutes Kemp's testimony. As the defendant points out, during Investigator Troutt's interview of Hunter, as reflected in Troutt's interview report, "Mr. Hunter advised that Ms. Johnson's 'baby-daddy' served him with the illegal narcotics outside the residence." (Hr'g Ex. 2, Doc. No. 100-2, at 12.) The government claims that there is no evidence that Kemp was present for that part of Troutt's interview with Hunter, which appears from the video submitted by the government to be true.

The government also claims that there is no evidence that Troutt shared the details of the Hunter interview with Kemp, which seems highly unlikely. Troutt's report notes that Kemp obtained a search warrant "[b]ased on this information," strongly suggesting that Troutt conveyed to Kemp the material aspects of his interview with Hunter.[3] Moreover, Troutt's report also stated that, during Hunter's ride to the residence with *both* Kemp and Troutt, "Mr. Hunter *again confirmed that Ms. Johnson's 'baby-daddy' conducted the exchange of money for the illegal narcotics*." (*Id.* (emphasis added).) Troutt's report constitutes strong circumstantial evidence that Kemp knew, at a minimum, that someone other than Tatiana Johnson had conducted the transaction.

The government claims that this is not new evidence and does not establish a misrepresentation by Kemp, because Kemp's Affidavit stated that the purchase was from "a guy known . . . as 'Pops" or 'L' and a girl known as 'Titi'" (Doc. No. 100-1, at 2), and Kemp testified consistently. Purchasing the drugs from both Johnson and "L" is different, however, from purchasing the drugs solely from "L," particularly where "L" was not known to live at the residence the police sought to search. In addition, Kemp stated at the *Franks* hearing that "[t]he only person[Hunter had] identified [by the time they drove to the residence] was Titi, Tatiana Johnson, and a guy named Pops. But more specifically Titi, Tatiana Johnson. That was his point of contact." (Doc. No. 150, at 51.) In other words, he implied that Johnson had a much greater role in the transaction than she actually had. Troutt's report indicates that Hunter had told Troutt and Kemp that "L" alone conducted the transaction.

But there is more. The defendant has submitted an audio recording of Kemp's initial interview of Hunter, conducted at Hunter's house before Hunter was transported to the police

---

[3] As the defendant argues: "Inasmuch as Inv. Kemp was the lead law enforcement agent assigned to the case, it is difficult to imagine that Inv. Troutt would not have apprised him of the complete description of how and where the heroin transaction believed to have preceded Katherine Stone's death occurred." (Doc. No. 175, at 5.)

station, which the government produced after the court denied the Motion to Suppress. This audio file reflects that Hunter specifically told Kemp that, although Johnson was the contact whose phone number he had, a "dude" he knew as "L" was the person from whom he actually bought the heroin and was "the one that came out" to conduct the transaction. (Def.'s Manually Filed Exhibit, audio recording, from 5:07–5:20, 6:17–6:34.) Hunter repeated that Johnson, who he believed was L's "baby mama," "don't really have nothing to do with it. I just call her." (*Id.* 6:42–6:50.) A purchase "from" the house, as stated in the Affidavit, is very different from purchasing the drugs outside the house. *Accord United States v. Higgins*, 557 F.3d 381, 390, (6th Cir. 2009) ("[T]his affidavit does not assert that the informant had been inside Higgins's apartment, that he had ever seen drugs or other evidence inside Higgins's apartment, or that he had seen any evidence of a crime other than the one that occurred when Higgins allegedly sold him drugs. Without such an assertion, the affidavit fails to establish the necessary nexus between the place to be searched and the evidence sought." (internal quotation marks and citation omitted)).

This newly produced evidence, particularly considered in light of Kemp's confusing and somewhat self-contradictory testimony and the other evidence in the record, including Troutt's report, establishes beyond any reasonable doubt that Kemp knew when he drafted the Affidavit in support of the search warrant that Josh Hunter and Katherine Stone had purchased drugs from "L," not Tatiana Johnson, and that the purchase took place outside of Johnson's residence. It is apparent to the court that Kemp intentionally or recklessly failed to include this information in the Affidavit and that he either misremembered these events or lied under oath before this court.

That conclusion is bolstered by Kemp's testimony, on cross examination, that he had attended numerous trainings on the need for a sufficient factual nexus between the suspected

crimes and the place to be searched in order to justify the issuance of a search warrant. (Doc. No. 150, at 72 ("A. And . . . the training is to understand the law about what's permitted for search warrants and what's required to go inside somebody's house? A. Correct.").) Kemp acknowledged that, in the course of this training, he had been given Sixth Circuit case law to examine, that his training was conducted by lawyers as well as by other police officers, and that he was "familiar with . . . case law that talks about how you need to be able to demonstrate . . . some information about knowing what's inside the house before you can get a search warrant to go inside the house." (Doc. No. 150, at 74; *see also id.* (agreeing that he was familiar with the term and concept of "nexus").) In other words, regardless of what the law might expect from a reasonably well informed police officer, Kemp's actual knowledge of the law explains why he might omit from his search warrant Affidavit the critical information that the person selling the drugs was someone *other* than the person who lived at the house he sought to search, that the drug purchase took place outside that residence, and that the informants never went inside the residence. It also provided a motive to retract his testimony in this court that Hunter told him, when they drove by the residence, that "L" had "come from that house and delivered the drugs"—which was entirely consistent with Troutt's report but inconsistent with the Affidavit and inconsistent with Kemp's assertion that he did not know that information until later.

Based on the totality of the evidence, Kemp's retraction of that statement, and the court's recollection of Kemp's demeanor while he was testifying, the court no longer finds Kemp's hearing testimony credible. In short, the court concludes that Kemp's Affidavit contained material knowing, intentional, or reckless falsities or omissions. Specifically, it omitted the information, known to Kemp, that the drug purchase was from the person Hunter knew as "L" and that it took place outside the residence. The *Leon* good-faith exception does not apply, and

the evidence seized during the search must be suppressed.

## V.     ORDER

The search warrant in this case was not supported by probable cause. Moreover, because Kemp's Affidavit contained knowing, material falsities or omissions, the warrant is not saved by the *Leon* good-faith exception. That part of the May 2018 Memorandum and Order inconsistent with this conclusion is **VACATED**. The Motion for Reconsideration (Doc. No. 152) is **GRANTED**, and the defendant's Motion to Suppress (Doc. No. 100) is **GRANTED**. All evidence derived from the unlawful search and the fruits thereof are **SUPPRESSED**. *Wong Sun v. United States*, 371 U.S. 471, 486 (1963); *United States v. Pearce*, 531 F.3d 374, 381 (6th Cir. 2008).[4]

Trial remains scheduled for April 2, 2019 at 9:00 a.m. before the undersigned.

It is so **ORDERED**.

ENTER this 25th day of February 2019.

_____
ALETA A. TRAUGER
United States District Judge

---

[4] The record does not contain an inventory of the items seized during the search, and the parties have not briefed the topic of what exactly must be suppressed.